## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JANE DOE 2, AND ALL OTHER CLASS MEMBERS AS DEFINED HEREIN,** )<br><br>**Plaintiffs,** )<br><br>**v.** )<br><br>**THE GEORGETOWN SYNAGOGUE - KESHER ISRAEL CONGREGATION, THE NATIONAL CAPITAL MIKVAH, INC., and RABBINICAL COUNCIL OF AMERICA** )<br><br>**Defendants.** ) | **Case. No. 1:15-cv-00028** |

## PLAINTIFFS' MOTION TO REMAND CASE AND/OR TO STAY CASE EXCEPT FOR DISCOVERY REGARDING CLASS MEMBERSHIP

### Introduction

Two of the three Defendants, The Georgetown Synagogue - Kesher Israel Congregation ("Kesher Israel") and the National Capital Mikvah, Inc. ("NCM") ("collectively, "Defendants") have removed this action to Federal Court under the "Class Action Fairness Act" (28 U.S.C. § 1332(d)).[1] ("CAFA") Plaintiff Jane Doe 2 , now moves pursuant to 28 U.S.C. § 1447(c) to remand this case to the Superior Court of the District of Columbia.[2]

This suit must be remanded to D.C. Superior Court. 28 U.S.C. § 1332(d)(3) provides an "interests-of-justice exception" and § 1332(d)(4)(B) provides a "home state exception" to class action diversity jurisdiction within CAFA. Under the first exception, this Court should exercise

---

[1] The Rabbinical Council of America ("RCA") is the third Defendant and has not joined the removal petition.
[2] Plaintiffs have conferred with defense counsel regarding the instant Motion, prior to filing. Defense counsel oppose the instant Motion.

its discretion to abstain from exercising federal jurisdiction here.  All of the elements of the (d)(3) exception are present. It is evident from the face of the Complaint that: at least one-third of the class members are citizens of the forum state (the District of Columbia); the primary defendants are National Capital Mikvah, Inc. and Kesher Israel; D.C. law applies to Plaintiffs' claims; the D.C. forum has a direct nexus with class members, the harm alleged, and defendants; and, lastly, the claims asserted involve an entirely local matter as opposed to one of national or interstate interest. Barry Freundel, the voyeur rabbi, whose misdeeds produced this suit, is being prosecuted in the District of Columbia, and all critical events occurred in the District. Given these facts, the discretionary factors set forth in subsection (d)(3) weigh heavily in favor of remand. Plaintiffs have made a substantial showing that the interests-of-justice exception to CAFA jurisdiction applies to this case.

The "home state exception" also may compel remanding this case to D.C. Superior Court. This exception is not discretionary. The Court <u>must</u> decline jurisdiction when, as here, two-thirds or more of Plaintiff class members, as well as "the primary defedants," are citizens of the state in which the action was originally filed. 28 U.S.C. § 1332(d)(4)(B). As decribed *infra*, all elements of the home state exception are likely satisfied here.

In the alternative, if the Court cannot presently determine whether the class members are more than one-third or at least two-thirds D.C. citizens, then the Court should stay the case, including but not limited to the pending Motion of Defendants Kesher Israel and the NCM, to Consolidate and Stay Proceedings Pending Appointment of Interim Class Counsel ("Motion to Consolidate").  Defendants possess information regarding the citizenship of the class members. If the Court does not believe it can remand the case immediately, then the parties should promptly conduct discovery on the issue of class citizenship, before any other proceedings in the

Court go forward, so that this Court can preliminarily determine whether it should exercise jurisdiction under CAFA.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of despicable acts of voyeurism that Rabbi Bernard Freundel committed from 2005 to 2014.  During that period and earlier, Freundel was the rabbi of Defendant Kesher Israel Congregation, a modern Orthodox synagogue; he was the supervisory rabbi of Defendant National Capital Mikvah, Inc.; and he was a rabbi and significant religious authority ordained by Defendant Rabbinical Council of America ("Defendant RCA") (Complaint, ¶¶ 3-5, 14-15).  At all relevant times, Freundel was an employee and/or agent of Defendants Kesher Israel, NCM, and RCA, acting within the course and scope of his employment (Complaint, ¶¶ 3-5 ).

Defendant NCM owns and operates the NCM building.  The NCM building contains a mikvah, which is a ritual bath used in Judaism for physical and spiritual purification.  Since the construction of the NCM building, women visited the NCM building and used its mikvah for a variety of occasions, including but not limited to religious conversions, and following menstruation and childbirth (Complaint, ¶¶ 4, 6, 11).  Any woman who used the NCM mikvah would fully disrobe in the neighboring changing room, before immersing herself in the mikvah (Complaint, ¶ 7).

From the time that NCM building was constructed in 2005, Freundel secretly installed surveillance equipment in the NCM building's changing room to video-record women when they were disrobed and preparing to use the mikvah (Complaint, ¶ 11).  Freundel's transgressions, and his stockpiled recordings of innocent women, were discovered in October of 2014, to the shock and humiliation of the hundreds of women who used the NCM building's mikvah over the years

(Complaint, ¶¶ 12-13).  Plaintiff Jane Doe 2 was one of those women and, upon information and

belief, she was actually video-recorded by Freundel (Complaint, ¶¶ 21-22).

On December 18, 2014, Plaintiff Jane Doe 2 initiated the instant action by filing a lawsuit

in the Superior Court of the District of Columbia, individually, on behalf of herself, and on

behalf of the following class:

> Any and all women who used any portion of the mikvah utilized by Kesher Israel
> Synogogue, also known as The National Capital Mikvah, at any time since 2005
> to the present, including but not limited to women who used any portion of the
> mikvah either because Rabbi Fruendel arranged their attendance at the mikvah
> and/or Rabbi Fruendel solicited, initiated, and/or participated in any way in their use
> of the mikvah.

(Complaint, ¶ 25.)

The Complaint names three Defendants, Kesher Israel, NCM, and Rabbinical Council of

America, and makes five claims.  The five claims against the Defendants are: claims of (I)

intrusion upon seclusion, (II) negligent infliction of emotional distress, and (III) wiretapping,

against all Defendants on the basis of *respondeat superior*; (iv) negligent hiring, training,

retention, and supervision of Freundel, by all theDefendants; and (v) premises liability of

Defendant NCM, for allowing Freundel to make secret video recordings on its premises.

Plaintiffs served the Defendants with process.  Then, on January 8, 2015, Defendants

Kesher Israel and NCM jointly filed a Notice of Removal to this Court, on the basis of diversity

jurisdiction, which they claimed is established by 28 U.S.C. 1332(d)(2) of CAFA.

## ARGUMENT

In the Notice of Removal, Defendants Kesher Israel and NCM assert federal jurisdiction

exclusively on the basis of 28 U.S.C. § 1332(d)(2), under the Class Action Fairness Act

("CAFA").   Section 1332(d)(2) establishes the parameters of diversity jurisdiction in class

actions.  Under CAFA, federal courts obtain jurisdiction if the matter in controversy exceeds the

sum or value of $5,000,000; any member of the plaintiff class and any one of the defendants, are citizens of different states; and the class numbers 100 or more members.

However, §§ 1332(d)(3), (d)(4)(A), and (d)(4)(B), establish certain "exceptions" to CAFA diversity jurisdiction. *Serrano v. 180 Connect*, 478 F.3d 1018, 1023 (9th Cir. 2007). These are known, respectively, as the "interests-of-justice exception," the "local controversy exception," and the "home state exception." Of relevance to this case are the first and third exceptions, the interests of justice and home state exceptions.

The interests-of-justice exception requires that over one-third of the class members, and the "primary defendants," be citizens of the forum state. If the interests-of-justice exception governs, then it is within the Court's discretion not to exercise federal jurisdiction. The Court exercises its discretion by weighing six different factors set forth in subsection (d)(3), and explained *infra* at pages 8-10.

The home state exception requires that at least two-thirds of the class members, and the primary defendants, be citizens of the forum state. If the home state exception applies, then the Court **must** decline to exercise federal jurisdiction.

The exceptions to CAFA diversity jurisdiction are not limits upon subject matter jurisdiction. Rather, these exceptions dictate when the Court should not exercise federal jurisdiction, as a matter of abstention. *See Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011); *Graphic Communications Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 636 F.3d 971, 973 (8th Cir. 2011).

The U.S. District Court for the District of Oregon explained the function of the CAFA jurisdictional exceptions in *Bey v. Solarworld Indus. Am., Inc.* (hereinafter "*Bey II*"), 904 F. Supp. 2d 1103, 1107-1108 (D. Ore. 2012):

The § 1332(d)(4) exceptions "are designed to draw a delicate balance between making a federal forum available to genuinely national litigation and allowing the state courts to retain cases when the controversy is strongly linked to that state." *Hart v. FedEx Ground Package Sys.*, 457 F.3d 675, 682 (7th Cir. 2006). The § 1332(d)(4) exceptions serve this purpose by keeping "purely local matters and issues of particular state concern in the state courts." *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1194 (11th Cir. 2007).

With these principles in mind, Plaintiffs explain why the Court should remand the case to the Superior Court. Alternatively, the Court should stay the suit to conduct jurisdictional discovery in order to determine as soon as possible whether it is appropriate to remand the case under § 1332 (d)(3) or (d)(4)(B).

I. **The § 1332(d)(3) Discretionary Exception to CAFA Jurisdiction: It is evident from the Complaint that over one-third of the class members are D.C. citizens, that the primary defendants are D.C. citizens, and that the § 1332(d)(3) factors weigh heavily against exercising federal jurisdiction. Therefore, the Court should abstain from exercising jurisdiction, and remand this case immediately.**

As explained *infra*, it is evident that over one-third of the class members are D.C. citizens; the primary defendants are Defendant NCM and Kesher Israel; and the interests-of-justice factors weigh heavily in favor of local jurisdiction. Therefore, the Court should exercise its discretion to remand the case under the interests-of-justice exception.

1. **From the face of the Complaint, it is evident that more than one-third of the class members are D.C. citizens.**

Beyond question over one-third of the class members consist of D.C. citizens. In determining whether the CAFA exceptions to diversity jurisdiction apply, "it is permissible for a court to apply common sense and reasonable inferences." *Bey v. SolarWorld Indus. Am.* (hereinafter "*Bey I*"), 904 F. Supp. 2d 1096, 1102 (D. Ore. 2012) (referring to subsection (d)(4) exceptions). In particular, when it is obvious from the Complaint, the Court may estimate the proportion of the class members who are citizens of the forum state. *See Caruso v. Allstate Ins. Co.*, 469 F. Supp. 2d 364, 367-68 (E.D. La. 2007) (inferring from complaint that **more than two-thirds** of class members were Louisiana citizens).

It is apparent from the Complaint that the overwhelming majority of the class members were D.C. citizens at the time the complaint was filed. *See* § 1332(d)(7) (CAFA class citizenship determined from time complaint was filed). All class members utilized the NCM building's mikvah, located in D.C. Complaint, ¶¶ 6, 25. This by itself indicates the class members are overwhelmingly D.C. citizens. Additionally, the NCM Mikvah was affiliated with Defendant Kesher Israel, an Orthodox Jewish congregation. It is probable that most, if not all, congregants were Orthodox Jews who are religiously prohibited from travelling via car, train, or plane on Saturdays. This would imply that the persons who utilized the NCM Mikvah predominantly walked, and therefore lived nearby in D.C. There is another mikvah in Washington, D.C., but that one is associated with a Conservative Jewish synagogue. [http://adasisrael.org/mikvah/] It is therefore reasonable to assume that most, if not all of those using the NCM mikvah were D.C. Orthodox Jews. Furthermore, there are Orthodox mikvahs in nearby Silver Spring, MD, and northern Virginia, to serve Orthodox Jews domiciled outside D.C. These facts strongly suggest that, overwhelmingly, users of the mikvah were Orthodox Jews who lived in the District of Columbia. Indeed, once the proper forum for this case is determined, Plaintiffs intend to add as class representatives a female Orthodox Jew who lives in D.C. and used the mikvah on a monthly basis.

"Common sense and reasonable inferences" dictate that, based on the Complaint, more than one-third of the class members are domiciled in D.C., and are therefore citizens of D.C. *See Lopes v. JetSetDC*, 4 F. Supp. 3d 238, 241 (D.D.C. 2014) (individual's citizenship is synonymous with domicile, which depends upon where a person is physically present and where he or she intends to reside indefinitely).

### 2. Under the Complaint, the sole "primary defendants" are Defendants NCM and Kesher Israel.

The final Senate Judiciary Committee's report on CAFA states:

"For purposes of class actions that are subject to subsections1332(d)(3) and [(d)(4)(B)], the Committee intends that 'primary defendants' be interpreted to reach those defendants who are the 'real targets' of the lawsuit – *i.e.*, the defendants that would be expected to incur most of the loss if liability is found. Thus, the term 'primary defendants should include any person who has substantial exposure to significant portions of the proposed class in the action, particularly any defendant that is allegedly liable to the vast majority of the members of the proposed classes (as opposed to simply a few individual class members)."

S. Rep. 109-14, at 43.

Under this standard, Defendants NCM and Kesher Israel are the primary defendants in this lawsuit. Defendant NCM owned and operated the NCM mikvah, the site of all wrongdoing, and only Defendant NCM is named in Count V ("premises liability") and every other count. Furthermore, Defendant Kesher Israel is based practically next to the NCM mikvah, and was the primary employer of Freundel.

There can be no debate that Defendant National *Capital* Mikvah, Inc.; and Defendant The *Georgetown* Synagouge – Kesher Israel Congregation; are based in, and citizens of, D.C. Therefore, the sole primary defendants in this case are citizens of the forum jurisdiction.

### 3. The "interests-of-justice" factors weigh heavily in favor of local jurisdiction.

Plaintiffs herein set forth the six factors contained in § 1332(d)(3), and explain why overall they favor local jurisdiction:

#### "(A) [W]hether the claims asserted involve matters of national or interstate interest."

The claims in this case do not present "matters of national or interstate interest." To the contrary, they present an incident of local notoriety, based on illicit conduct that was committed in D.C. by a rabbi who lived and practiced in D.C. against a class of victims, most of whom lived in D.C., as discussed *supra*. This is a D.C.-centric lawsuit.

**"(B) [W]hether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States."**

All of the claims in this case are governed by D.C. law, as all of the tortious acts occurred in D.C.. (See Complaint ¶ 1.)

**"(C) [W]hether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction."**

The class action has not been pleaded "in a manner that seeks to avoid Federal jurisdiction." Rather, the D.C.-centered nature of this action is inherent to the facts of the case.

**"(D) [W]hether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants."**

The action was filed in D.C., a forum with a "distinct nexus" to the class members, the alleged harm, **and** the Defendants.

**"(E) [W]hether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States."**

As discussed *supra*, the class members are predominantly D.C. citizens, so "the number of citizens of [D.C.] . . . is substantially larger than the number of citizens from any other State."

**"(F) [W]hether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed."**

Subsection (d)(3)(F) is the only factor that arguably weighs in favor of federal jurisdiction. On December 2, 2014, 16 days before the instant action was filed in the Superior Court, a different woman denoted as "Jane Doe" filed a similar class action lawsuit in the Superior Court, Case No. 2014 CA 007644 B. On January 8, 2015, that suit was also removed to this Court, and now proceeds under Case No. 1:15-cv-00026.

The function of subsection (d)(3)(F) is to encourage the consolidation of similar class actions within one forum. *See Vodenichar v. Halcón Energ Props.*, 733 F.3d 497, 508 (3rd Cir. 2013). But keeping the instant action in this Court would not serve this interest, for multiple reasons.

First, Case No. 1:15-cv-00026 differs from the instant case in several important respects, that make consolidation undesirable. The defendants in the two cases are not the same (unlike this suit, the other action names the Georgetown University as a defendant), and the class definitions differ. (See Complaint ¶ 25; *Exhibit A*, Amended Complaint in Case No. 1:15-cv-00026, ¶ 119.)

Additionally, Case No. 1:15-cv-00026, like this one, **also is likely to be remanded,** under the CAFA exceptions. *See* § 1332(d)(4)(A)(ii).)

In any event, Congress did not make the subsection (d)(3)(F) factor alone dispositive; there are six factors set forth for a reason. *See Sorrentino v. ASN Roosevelt Ctr., LLC*, 588 F. Supp. 2d 350, 359 (E.D. N.Y. 2008) ("The plaintiff need not satisfy all factors, rather a balancing test should be applied taking into consideration the 'totality of the circumstances.'"). Taken together, the six factors indicate that this action is a local D.C. controversy and belongs back in the Superior Court.

## II. The § 1332(d)(4)(B) Home State Exception to CAFA Jurisdiction: It is evident from the Complaint that at least two thirds of the class members are D.C. citizens, and that the primary defendants are D.C. citizens. Therefore, the Court *must* abstain from exercising jurisdiction, and remand this case immediately.

Plaintiffs argued *supra* in Section I that, at the least, the interests-of-justice exception applies because more than one-third of the class members are D.C. citizens. But, for the reasons explained *supra* in Section I(1), from the face of the Complaint it is apparent that not just over one-third, but **at least two-thirds**, of the class members are D.C. citizens.

Taken in combination with the fact that the primary defendants are also D.C. citizens (as discussed *supra* at Section I(2)), it follows that under § 1332(d)(4)(B), the Court **must** remand this case, and has no discretion to do otherwise.

III.    **If the Court concludes that it cannot remand the case immediately, then the Court should stay the case, except to permit limited discovery on the issue of the citizenship of the class members, so that the Court can decide whether to remand the case.**

Assuming *arguendo*, that the Court cannot immediately decide what proportion of the class members are D.C. citizens, then the appropriate relief is to stay the case except to conduct discovery to determine this limited issue.  Even if the class membership is unknown, it is certainly apparent from the face of the Complaint that the class members are likely at least two-thirds – or, if not, then more than one-third -- D.C. citizens.  It is furthermore apparent that, if there are enough D.C. citizens among the class members, then the case should or must be remanded under the interests-of justice exception or the home state exception, as explained *supra* in Section I.

Plaintiffs have already made a substantial showing that one of the CAFA jurisdictional exceptions likely applies.  Furthermore, the additional information that needs to be discovered – the citizenship of the class members – is within the possession of Defendants, who presumably have records on who utilized the NCM building's mikvah.  Given both these circumstances, it is appropriate to allow Plaintiffs to conduct discovery regarding the jurisdictional issue of class citizenship.  *See Baker v. PDC Energy, Inc.*, 2014 U.S. Dist. LEXIS 170093, *3-4 (D. Colo. 2014); *Abdale v. N. Shore-Long Island Jewish Health Sys.*, 2014 U.S. Dist. LEXIS 8881, *31 (E.D. N.Y. 2014); *Bey I*, 904 F. Supp. 2d at 1103; *Barricks v. Barnes-Jewish Hosp.*, 2012 U.S. Dist. LEXIS 51422, *6-7 (E.D. Mo. 2012).

In addition to allowing discovery on the limited issue of class citizenship, it makes sense to otherwise stay the case, because this one limited issue will determine whether the Court should proceed with the case. See *Abdale*, 2014 U.S. Dist. LEXIS at *31-33 (reserving judgment on pending motion to dismiss, and ordering expedited discovery on issue of class citizenship); *Mello v. AppleIllinois, LLC*, 2012 U.S. Dist. LEXIS 109025 (N.D. Ill. 2012) (*sua sponte* suspending briefing schedule for pending summary judgment motions, and instead ordering parties to brief issue of class citizenship); *Barricks*, 2012 U.S. Dist. LEXIS at *7 (ordering parties to proceed with discovery limited to issue of class citizenship). Accordingly, if the Court decides it cannot remand the case immediately, the Court should order discovery on the issue of class membership, but otherwise stay the case.  (This includes reserving a decision on the pending Motion for Consolidation by NMC and Kesher-Israel.)

## **CONCLUSION**

It is apparent from the face of the Complaint that the Court should remand this case to the Superior Court, under the interests-of-justice exception to CAFA jurisdiction.

Alternatively, if the Court believes there is presently insufficient information to decide the citizenship of the class members, it is still apparent that one of CAFA exceptions likely applies.  Because there is a serious question as to whether the Court should exercise jurisdiction in this case, the Court should immediately stay the case, except to allow discovery on the issue of class citizenship.  Then, the Court can ultimately determine whether to remand the case.

WHEREFORE, Plaintiffs respectfully request that the Court remand this case to the

Superior Court for the District of Columbia; or, in the alternative, stay the case, except to

conduct discovery regarding class membership, and remand the case at a later time.[3]

_/s/ Matthew W. Tievsky_
Ira Sherman, Esquire
D.C. Bar No. 212175
Joseph Cammarata
D.C. Bar No. 389254
Allan M. Siegel
D.C. Bar No. 447705
Matthew W. Tievsky
D.C. Bar No. 1004955
1232 17th Street, N.W.
Washington, D.C. 20036
Tel: (202) 659-8600
Fax: (202) 659-8680
sherman@dc-law.net
joe@dc-law.net
matthew@dc-law.net
Attorneys for Plaintiffs

---

[3] For the Court's convenience, alternative proposed Orders are attached hereto.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiffs' Motion to Remand Case and/or to Stay Case Except for Discovery Regarding Class Membership, was served on January 22nd, 2015, by the Case Management / Electronic Case Files system, to:

> Edward Clark Bacon
> Bacon, Thornton & Palmer, LLP
> Capital Office Park
> 6411 Ivy Lane
> Suite 500
> Greenbelt, MD 20770
>
> Paul Blankenstein
> Maura McCormick Logan
> Gibson, Dunn & Crutcher, LLP
> 1050 Connecticut Avenue NW
> Washington, D.C. 20036
>
> Mark D. Harris
> Proskauer Rose, LLP
> Eleven Times Square
> New York, NY 10036

/s/ Matthew W. Tievsky
Matthew W. Tievsky

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOE 2, AND ALL OTHER CLASS MEMBERS AS DEFINED HEREIN, <br><br>     Plaintiffs, <br><br>   v. <br><br> THE GEORGETOWN SYNAGOGUE - KESHER ISRAEL CONGREGATION, THE NATIONAL CAPITAL MIKVAH, INC., and RABBINICAL COUNCIL OF AMERICA <br><br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    Case. No. Case. No. 1:15-cv-00028 |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## ORDER

Upon consideration of Plaintiffs' Motion to Remand Case and/or to Stay Case Except for Discovery Regarding Class Membership, it is on this ___ day of _____, 2015, hereby ORDERED that the Motion is GRANTED; and, it is furthermore ORDERED that the case is hereby REMANDED to the Superior Court of the District of Columbia.


        _____
        Judge Christopher R. Cooper
        United States District Court
        for the District of Columbia

*Cont'd*

CC:

David Sanford
Sanford Heisler Kimpel, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY 10019

Ira Sherman
Joseph Cammarata
Allan M. Siegel
Matthew W. Tievsky
CHAIKIN, SHERMAN,
  CAMMARATA & SIEGEL, P.C.
1232 17th Street, N.W.
Washington, D.C. 20036

Edward Clark Bacon
Bacon, Thornton & Palmer, LLP
Capital Office Park
6411 Ivy Lane
Suite 500
Greenbelt, MD 20770

Paul Blankenstein
Maura McCormick Logan
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue NW
Washington, D.C. 20036

Mark D. Harris
Proskauer Rose, LLP
Eleven Times Square
New York, NY 10036

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOE 2, AND ALL OTHER CLASS MEMBERS AS DEFINED HEREIN, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| THE GEORGETOWN SYNAGOGUE - KESHER ISRAEL CONGREGATION, THE NATIONAL CAPITAL MIKVAH, INC., and RABBINICAL COUNCIL OF AMERICA | ) ) ) ) ) |
| Defendants. | ) ) ) ) |

Case. No. Case. No. 1:15-cv-00028

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## ORDER

Upon consideration of Plaintiffs' Motion to Remand Case and/or to Stay Case Except for Discovery Regarding Class Membership, it is on this ___ day of _____, 2015, hereby ORDERED that the Motion is GRANTED; and, it is furthermore ORDERED that the case is hereby STAYED, except that the parties may conduct discovery on the issue of the citizenship of the class members.

_____
Judge Christopher R. Cooper
United States District Court
for the District of Columbia

*Cont'd*

CC:

David Sanford
Sanford Heisler Kimpel, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY 10019

Ira Sherman
Joseph Cammarata
Allan M. Siegel
Matthew W. Tievsky
CHAIKIN, SHERMAN,
   CAMMARATA & SIEGEL, P.C.
1232 17th Street, N.W.
Washington, D.C. 20036

Edward Clark Bacon
Bacon, Thornton & Palmer, LLP
Capital Office Park
6411 Ivy Lane
Suite 500
Greenbelt, MD 20770

Paul Blankenstein
Maura McCormick Logan
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue NW
Washington, D.C. 20036

Mark D. Harris
Proskauer Rose, LLP
Eleven Times Square
New York, NY 10036



## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

**JANE DOE,**
c/o SILVERMAN, THOMPSON, SLUTKIN & WHITE, LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201

and

**EMMA SHULEVITZ,**
c/o SILVERMAN, THOMPSON, SLUTKIN & WHITE, LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201

and

**STEPHANIE SMITH**
c/o SILVERMAN, THOMPSON, SLUTKIN & WHITE, LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201

*Plaintiffs,*

v.

**THE GEORGETOWN UNIVERSITY,**
37th & O Streets, NW
204 Healy Hall
Washington, D.C. 20057

<u>SERVE ON:</u>

Lisa Brown, Registered Agent
37th & O Streets, NW
202 Healy Hall
Washington, D.C. 20057

and

**THE GEORGETOWN SYNAGOGUE –
KESHER ISRAEL CONGREGATION,**
2801 N Street, NW
Washington, D.C. 20007

<u>SERVE ON:</u>

The Georgetown Synagogue – Kesher
Israel Congregation
2801 N Street, NW
Washington, D.C. 20007

and



FILED
CIVIL ACTIONS BRANCH

DEC 18 2014

Superior Court
of the District of Columbia
Washington, D.C.

CASE No. 2014 CA 007644 B
Judge Herbert B. Dixon, Jr.
Next Event:   Initial Scheduling Conference
March 6, 2015 at 9:30 a.m.





COMPLETED



EXHIBIT

A

| | |
|---|---|
| **THE NATIONAL CAPITAL MIKVAH, INC.,**<br>1308 28th Street, NW<br>Washington, D.C. 20007<br><br>**SERVE ON:**<br><br>    Sarah Barak, Registered Agent<br>    1559 33rd Street, NW<br>    Washington, D.C. 20007<br><br>and<br><br>**HISTADRUTH HORABONIM<br>DEAMERICA – RABBINICAL COUNCIL<br>OF AMERICA, INC.,**<br>305 Seventh Avenue, 12th Floor<br>New York, New York 10001<br><br>**SERVE ON:**<br><br>    Secretary of State<br>    New York Department of State<br>    One Commerce Plaza<br>    99 Washington Avenue<br>    Albany, New York 12231<br><br>        *Defendants.* | |

## AMENDED CLASS ACTION & INDIVIDUAL COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs Jane Doe ("Jane Doe"),[1] Emma Shulevitz ("Emma"), and Stephanie Smith

("Stephanie") (collectively, "Plaintiffs" or the "Named Plaintiffs") individually and on behalf of

the class of similarly situated individuals,[2] by and through their undersigned attorneys, hereby

sue Defendants The Georgetown University ("Georgetown"), The Georgetown Synagogue –

Kesher Israel Congregation ("Kesher Israel"), The National Capital Mikvah, Inc. ("NCM"), and

---

[1]   Pursuant to the D.C. Superior Court Rules of Civil Procedure, contemporaneous with the filing of the initial Complaint, Jane Doe filed a motion to proceed under a pseudonym (the "Pseudonym Motion") setting forth the precise legal and factual basis for her need to conduct this litigation in this manner. The Court granted the Pseudonym Motion on December 1, 2014 (*see* Docket Nos. 4 & 5). Pursuant to the Court's prior Orders and based on Plaintiffs' concern for their safety, Plaintiffs have used their attorneys' address as the address of record. Defendants will be furnished with Plaintiffs' full addresses at the appropriate time.

[2]   Plaintiffs assert class action claims against The Georgetown Synagogue – Kesher Israel Congregation, The National Capital Mikvah, Inc., and Histadruth Horabonim Deamerica – Rabbinical Council of America, Inc. only. The claims against The Georgetown University are brought solely in Jane Doe's individual capacity at this stage of the proceedings.

2

Histadruth Horabonim Deamerica – Rabbinical Council of America, Inc. (the "RCA") (collectively, the "Defendants"), and state as follows:

## I.   **INTRODUCTION**

1.      This case arises from an unfathomable breach of trust by a prominent religious leader and scholar and Defendants' utter failure to prevent and/or to stop it. Rabbi Bernard "Barry" Freundel, Ph.D. ("Freundel") lured his students, congregants, and other women into the sacred religious cleansing ritual of "mikvah" to sexually exploit the women without their knowledge or consent by capturing their naked images using concealed cameras and recording devices. For years, Defendants turned a blind eye to obvious signs of Freundel's increasingly bizarre and obviously improper behavior, ignoring the bright red flags that Freundel was acting inappropriately with women subjected to his authority. Defendants were derelict in their duties to their congregants, students, and those seeking to join or considering joining their ranks, thereby permitting Freundel's devastating sexual exploitation of Plaintiffs and other similarly situated women.

2.      Jane Doe is a third-year law student at Georgetown University Law Center ("Georgetown Law") who is devoted to her Jewish faith and who selected Georgetown Law because of its reputation for excellence and diversity.

3.      Jane Doe was excited to enroll in a "Jewish Law Seminar" course (the "Jewish Studies" class) co-taught by Freundel and Rabbi David Saperstein. Freundel suggested that she write the mandatory research paper on the mikvah ritual and, as part of her Jewish Studies class, Freundel required Jane Doe to participate in the immersion ritual at the mikvah built by Kesher Israel and owned and operated by NCM (the "NCM/Kesher Israel Mikvah"). Freundel also invited her to attend services at Kesher Israel on numerous occasions and to join his family and the Kesher Israel community at religious dinners at the Kesher Israel Rabbinical Residence,

3

including Friday night Sabbath dinner and Passover Seder. Jane Doe was thrilled to be part of a thriving and intellectual religious community and to be integrating her legal education with her Jewish faith. She was devastated when she learned that Freundel had used his positions with Georgetown Law, Kesher Israel, NCM, and the RCA to lure her to the NCM/Kesher Israel Mikvah to sexually exploit her. Freundel's breach of trust has cut Jane Doe to her core— shattering her trust in religious and educational institutions that have failed to live up to their reputations for excellence.

4.      Plaintiff Emma is a 27-year-old woman who converted to Judaism in August 2013. Born to a Jewish father and a non-Jewish mother,[3] in 2012 Emma sought Freundel's counseling, supervision, and sponsorship for her conversion to Judaism so that she could be married in accordance with the Jewish faith. Freundel led Emma through the conversion process based on this authority as an agent of RCA and Kesher Israel.

5.      For over a year,[4] Emma followed all the requirements prescribed by Freundel, including: participating in often awkward one-on-one meetings with Freundel, attending lectures, and visiting Israel. Emma was particularly disturbed by Freundel's request that she do a "practice dunk" in the NCM/Kesher Israel Mikvah that "wouldn't count" for her conversion. Emma was so uncomfortable with Freundel she eventually abandoned the conversion process with him and completed the process with another rabbi.

6.      Emma, who is now eight months pregnant with her first child, was devastated to learn that Freundel used his authority under the RCA and his position with Kesher Israel and NCM to lure her to the NCM/Kesher Israel Mikvah to sexually exploit her.

---

[3]   Judaism is matrilineal, meaning the religion passes through the mother. Accordingly, although Emma's father was Jewish, because her mother was not, Emma was not considered to be Jewish in the Orthodox community until she converted in August 2013.

[4]   Emma ultimately completed her conversion with a different sponsoring rabbi out of New York .

7.      Stephanie is a rising senior at Towson University ("Towson"), where Freundel was a tenured professor. In the fall semester of 2013, she took Freundel's Faith Perspectives in Medical Ethics course. Stephanie is not Jewish and she told Freundel she had no interest in converting to Judaism. Nonetheless, Freundel repeatedly invited her and other select students to the NCM/Kesher Israel Mikvah. In February 2014, Stephanie participated in an unconventional immersion at NCM/Kesher Israel Mikvah.

8.      Like her fellow Plaintiffs, Stephanie was shocked and horrified to learn that Freundel had used his positions as a religious leader with NCM, Kesher Israel and the RCA to sexually exploit her.

9.      Plaintiffs assert the causes of action detailed herein against Kesher Israel, NCM, and the RCA individually and on behalf of the entire class of women who were sexually exploited by Freundel at the NCM/Kesher Israel Mikvah and at the Kesher Israel Rabbinical Residence based on Defendants' utter failure (i) to investigate Freundel prior to hiring him and placing him in a position of authority, and (ii) to take any meaningful action to prevent the obvious harm Freundel posed to congregants, female conversion candidates, and other women.

10.     Plaintiffs also assert the causes of action detailed herein against Kesher Israel, NCM, and the RCA individually and on behalf of the entire class of women who were sexually exploited at the NCM/Kesher Israel Mikvah and at the Kesher Israel Rabbinical Residence through the acts of these Defendants' employee, agent, and/or servant -- Freundel.

11.     Plaintiff Jane Doe further asserts the causes of action detailed herein against Georgetown in her individual capacity.

## II.    PARTIES, JURISDICTION, & VENUE

12.     Plaintiff Jane Doe is a natural person who resides in the District of Columbia.

13.     Plaintiff Emma Shulevitz is a natural person who resides in Rockville, Maryland.

5

14.     Plaintiff Stephanie Smith is a natural person who resides in Towson, Maryland.

15.     Defendant Georgetown is a private educational institution organized and existing under the laws of the District of Columbia with its principal place of business at 37th & O Streets, NW, 204 Healy Hall, Washington, D.C. 20057. Georgetown Law is one of the many graduate schools within the Georgetown institution.

16.     Defendant Kesher Israel is a private religious institution organized and existing under the laws of the District of Columbia with its principal place of business at 2801 N Street, NW, Washington, D.C. 20007. Kesher Israel raised the money necessary to build the mikvah owned and operated by NCM.

17.     Defendant NCM owns and operates the NCM/Kesher Israel Mikvah and is organized and existing under the laws of the District of Columbia with its principal place of business at 1308 28th Street, NW, Washington, D.C. 20007.

18.     Defendant RCA is a professional organization for Orthodox rabbis in the United States organized and existing under the laws of the state of New York with its principal place of business at 305 Seventh Avenue, 12th Floor, New York, New York 10001. The RCA organized and currently oversees the regional rabbinical "courts" (the "Beth Din") that are tasked with supervising, authorizing, and approving conversions to Judaism.

19.     This Court has subject matter jurisdiction over this action pursuant to D.C. Code Ann. § 11–921(a) because this action is being brought in the District of Columbia.

20.     This Court has personal jurisdiction over Defendants Georgetown, Kesher Israel, and NCM pursuant to D.C. Code Ann. § 13–422 because each of these Defendants is organized under the laws of the District of Columbia and maintains its principal place of business in the District of Columbia.

21.     In addition and in the alternative, this Court has personal jurisdiction over Defendants Georgetown, Kesher Israel, and NCM pursuant to D.C. Code Ann. § 13–423(a)(1) and (3) because each Defendant transacts business in the District of Columbia and caused tortious injury to Plaintiffs in the District of Columbia by an act or omission in the District of Columbia.  Further, this Court has personal jurisdiction over Defendant RCA pursuant to D.C. Code Ann. § 13–423(a)(1) and (3) because the RCA directly, and/or through its agent Freundel, transacts business in the District of Columbia and caused tortious injury to Plaintiffs in the District of Columbia by an act or omission in the District of Columbia.

22.     Venue in this Court is proper because each of the above-mentioned Defendants' acts and omissions described in this Amended Complaint occurred within the District of Columbia.

### III.     FACTS COMMON TO ALL COUNTS

23.     At all relevant times, Freundel served as the Rabbi at Kesher Israel. Freundel did so as an actual and/or apparent agent, servant, and/or employee of Kesher Israel.

24.     At all relevant times, Freundel also served as the supervising Rabbi of the NCM/Kesher Israel Mikvah. Freundel did so at all times as an actual and/or apparent agent, servant, and/or employee of NCM.

25.     At all relevant times, Freundel also was a member of the RCA and served in various roles within the RCA including, but not limited to, Chairman of the Geirus Policies and Standards Committee and, upon information and belief, vice president of the RCA. Freundel did so at all times as an actual and/or apparent agent, servant, and or employee of the RCA.

26.     At all relevant times, Freundel also served on the Washington Beth Din organized and overseen by the RCA. Freundel did so at all times as an actual and/or apparent agent, servant, and or employee of the RCA.

27.     At all relevant times, Freundel was an Adjunct Professor at Georgetown, where he taught Georgetown Law school students, including Plaintiff Doe, educational courses including, but not limited to, the Jewish Studies class. Freundel did so at all times as an actual and/or apparent agent, servant, and/or employee of Georgetown.

**A.     FREUNDEL CREATES FOR HIMSELF A POWERFUL LEADERSHIP POSITION IN THE WASHINGTON METROPOLITAN JEWISH COMMUNITY**

28.     Kesher Israel selected Freundel to be its leader in 1987. According to Kesher Israel's website, "with his exceptional intellectual mind, Rabbi Freundel helped Kesher Israel become a beacon of modern orthodoxy and a shul that sees traditional Judaism as essential, while also understanding the value of modern society." Kesher Israel's website also indicates: "During Rabbi Freundel's tenure, Kesher Israel experienced growth in membership and the expansion of the congregant demographic to include college and graduate students, young professionals, interns . . . ."

29.     At all relevant times, Freundel resided at 2801 N Street, NW, Washington, D.C. 20007, in a dwelling that was owned, operated and managed by Kesher Israel and that was used by Freundel in connection with his official Kesher Israel functions (the "Rabbinical Residence").

30.     In addition to leading the Kesher Israel congregation, Freundel also maintained a leadership role in the broader Orthodox community.

31.     Most notably, Freundel was a leader within the RCA, a national non-profit organization whose mission is "to advance the cause and voice of the Torah and the rabbinic tradition by promoting the welfare, interests, and professionalism of Orthodox rabbis all around the world."

32.     In particular, Freundel was the architect of the RCA's Geirus Policies and Standards ("GPS") system, and served as the long-time chair of that committee within the RCA.

33.     The GPS's primary mission is to provide a centralized system of standards Orthodox rabbis must follow for "converts" and/or individuals not recognized by the RCA as "Jewish" who wish to convert to Judaism. Conversion is critical to certain individuals because in the Orthodox community it serves as a prerequisite to a Jewish marriage, can determine whether an individual's offspring are considered to be "Jewish," is a prerequisite to Israeli citizenship, and it can affect an individual's right to purchase real property in Israel.

34.     Freundel devised a system of regional Beth Din that function under the direction and leadership of local rabbis and that are sanctioned by the RCA's GPS program, which Freundel headed.

35.     Freundel sat on the Washington Beth Din and, because of his leadership positions in the broader Orthodox community, served as the ultimate arbiter for any person seeking to convert to Judaism in the metropolitan Washington area and, with the full knowledge and support of Kesher Israel, NCM, and the RCA, Freundel placed himself in an excellent position to sexually and otherwise exploit converts, over whom he exercised great power and control.

36.     Freundel also served as the head of the Rabbinical Council of Greater Washington, the Orthodox body that supervises kosher dietary laws in the greater Washington area.

**B.     FREUNDEL OPENS A MIKVAH AS A SEXUAL EXPLOITATION DEVICE**

37.     A "mikvah" is a pool of water in which members of the Jewish faith completely immerse themselves (the immersion is of the entire body including one's hair) while they are completely naked and stripped of all "barriers," including jewelry, makeup, and any other beauty products on the hair or skin. The purpose of the immersion ritual is to cleanse the soul and purify the participant. In recent years, survivors of sexual assault have participated in the mikvah ritual to help them heal emotionally and spiritually from the pain associated with sexual assault. The

pool of water at the NCM/Kesher Israel Mikvah resembles a large bathtub and is adjacent to a bathroom (the "Changing Room") that participants use to shower and prepare for the immersion ritual.

38.     Converts to Judaism are required to immerse in a mikvah as the final step in the conversion process. Although a mikvah is traditionally used only by Jewish persons and those persons about to convert to Judaism, Freundel often urged individuals traditionally not welcome in a mikvah, including non-Jews and unmarried women, to use the NCM/Kesher Israel Mikvah.

39.     Despite serious concerns within Kesher Israel and in the greater Jewish Orthodox community concerning Freundel's behavior toward converts, Kesher Israel permitted Freundel to establish a mikvah that would essentially be controlled by Freundel under the auspices of Kesher Israel. Upon information and belief, Freundel wanted to set up a mikvah that would be completely under his control, that no other Orthodox rabbi would be permitted to use, and that would be open to conversion students and converts to Judaism.

40.     Upon information and belief, Freundel used Kesher Israel's assets to plan and fund the proposed mikvah and, with Kesher Israel's knowledge and consent, he began diverting donations made to Kesher Israel to his effort to found and construct what ultimately became the NCM/Kesher Israel Mikvah.

41.     According to public filings with the Department of Consumer and Regulatory Affairs for the District of Columbia ("DCRA"), NCM incorporated in 2000 for the sole purpose of operating the mikvah.

42.     DCRA filings indicate that NCM's "business address" is the same as the address used by Kesher Israel: 2801 N. Street, NW, Washington, D.C. 20007.

43.     Further, DCRA filings reveal that NCM's Director and Resident Agent is Sarah Barak. Upon information and belief, Sarah Barak is the wife of David Barak, who sat on Kesher Israel's Board of Directors, is a former President of the NCM/Kesher Israel Mikvah, and who has maintained a leadership role in the Kesher Israel congregation.

44.     Upon information and belief, Defendants Kesher Israel and NCM opened the NCM/Kesher Israel Mikvah in 2005 in the basement of the building adjacent to Kesher Israel.

45.     At all relevant times, Freundel was in charge of performing and overseeing the sacred religious immersion rituals at the NCM/Kesher Israel Mikvah.[5]

46.     Defendants Kesher Israel and NCM operated the NCM/Kesher Israel Mikvah with the assistance of their agent/employee Freundel and Freundel oversaw and performed the immersion rituals on the property of NCM and/or Kesher Israel. Freundel did so as an actual and/or apparent agent, servant, and/or employee of Kesher Israel, NCM, and/or the RCA.

C.     **FREUNDEL USES HIS POSITION AT GEORGETOWN LAW TO LURE JANE DOE TO THE NCM/KESHER ISRAEL MIKVAH**

47.     In 2014, Jane Doe was enrolled in Freundel's Jewish Studies class at Georgetown Law, which is co-taught by Rabbi David Saperstein, President Obama's recent nominee to serve as Ambassador-at-Large for International Religious Freedom. The Jewish Studies class requires, among other things, that each student write a 25-page research paper on an approved topic that is related to Jewish law.

48.     On or about January 22, 2014, and prior to the start of that evening's class, Jane Doe approached Freundel seeking assistance in selecting a topic for her research paper. While acting in his capacity as a Georgetown adjunct professor, Freundel immediately, and without

---

[5]   Pursuant to the law associated with mikvah, Freundel was not present in the mikvah bathing area during the immersion. Instead, a female attendant was present throughout the ritual and Freudel remained in a waiting area antechamber.

hesitation, urged Jane Doe to write her research paper about the mikvah ritual. Freundel advised

Jane Doe that one of his former Georgetown Law students previously wrote a research paper

about mikvah, that the paper was "very successful," and that the former student "got an A."

Freundel insisted that Jane Doe write about mikvah, going so far as to, on the spot, provide Jane

Doe with an outline of the various issues to be addressed in her research paper. After that

evening's class, Freundel approached Jane Doe and invited her to immerse at the NCM/Kesher

Israel Mikvah. Freundel urged Jane Doe, as research for her paper, to call him to set up a time to

attend the NCM/Kesher Israel Mikvah.

49.     Because Jane Doe sought Freundel's assistance in selecting a topic for her

research paper, she became one of a handful of students assigned to be mentored by Freundel in

the Jewish Studies class.

50.     Jane Doe visited the NCM/Kesher Israel Mikvah and immersed two separate times

as part of the research for her Georgetown Law-required research paper.

51.     In February 2014, Freundel and Jane Doe communicated via e-mail regarding

scheduling her first visit to the NCM/Kesher Israel Mikvah.

52.     On or about March 2, 2014, Jane Doe went to the NCM/Kesher Israel Mikvah.

Before the immersion rituals began, Freundel entered the Changing Room to prepare it for the

participants in the mikvah ritual. Thereafter, Freundel accompanied Plaintiff Jane Doe into the

Changing Room and specifically directed her where she should place her clothing when she

undressed, where and how to shower, and what bath products to use. Once Freundel exited the

Changing Room area, Jane Doe undressed, showered, entered the mikvah's ritual bath area, and

immersed herself while fully nude in the NCM/Kesher Israel Mikvah in accordance with

Freundel's instructions. Following her immersion, Freundel invited Jane Doe to Passover

12

services at Kesher Israel and to a Passover Seder being held at the Kesher Israel Rabbinical Residence.

53.     In or around March 2014, Freundel approached Jane Doe and inquired about her experience immersing in the NCM/Kesher Israel Mikvah. After discussing Jane Doe's first mikvah experience, Freundel urged her to participate in a second immersion at the NCM/Kehser Israel Mikvah where just she and Freundel would be present. Jane Doe did not follow up on Freundel's invitation.

54.     On or about March 31, 2014, and without request or prior inquiry from Jane Doe, Freundel e-mailed  her and asked her to return to the NCM/Kesher Israel Mikvah on the following Thursday to participate in a second immersion.

55.     On or about April 2, 2014, Freundel called Jane Doe to confirm she would attend the NCM/Kesher Israel Mikvah on April 3, 2014 because Freundel wanted to make sure he was present during her second visit.

56.     On or about April 3, 2014, Jane Doe returned to the NCM/Kesher Israel Mikvah. As he had before, Freundel entered the Changing Room to organize it for Jane Doe's pre-immersion preparations. Freundel once again accompanied Jane Doe into the Changing Room and, again, specifically directed her where she should place her clothing when she undressed, where and how to shower, and what bath products to use. As before, once Freundel had exited the Changing Room, Jane Doe undressed, showered, went into the mikvah's ritual bath area, and immersed herself while fully nude in the NCM/Kesher Israel Mikvah in accordance with Freundel's instructions.

57.     Following her second immersion in the NCM/Kesher Israel Mikvah, Freundel reiterated his prior invitation to attend Passover services at Kesher Israel and, after the services,

to attend a Passover Seder with his family and others at the Kesher Israel Rabbinical Residence. On several occasions, Freundel had also invited Jane Doe to attend Shabbat services at Kesher Israel and, following those services, to attend Shabbat dinners with his family and others at the Kesher Israel Rabbinical Residence.

58.     In or around May 2014, Jane Doe submitted her research paper to Georgetown Law as her official final examination in the Jewish Studies class. Jane Doe's research paper was entitled: "The *Mikveh*: Expanding the Ritual for Jewish Women" (the "Paper").

59.     In her Paper, Jane Doe explicitly states she immersed in the NCM/Kesher Israel Mikvah "as a research tool for this paper."

60.     Indeed, the Paper details how Jane Doe twice immersed herself in the NCM/Kesher Israel Mikvah at the request of her Georgetown Law professor. Jane Doe notes that her second immersion was to "continue my research for this paper" and "to connect to Judaism on a deeper level." Jane Doe further observes that with the facilitation of her trusted Georgetown Law professor, "I transformed the meanings of those waters and made it my own. I reinterpreted the ritual to purify my soul."

61.     Freundel and Saperstein gave Jane Doe's Paper an "A" and conferred on her an award for achieving the highest grade of all final research papers submitted in the Jewish Studies class. Georgetown Law also posted Jane Doe's Paper to an electronic database permitting other students to view the Paper as a "model examination."

**D.    FREUNDEL USES HIS POSITIONS WITHIN KESHER ISRAEL, NCM, AND THE RCA TO LURE CONVERSION CANDIDATES—LIKE EMMA—TO THE NCM/KESHER ISRAEL MIKVAH**

62.     Emma decided in 2012 she wanted to formally convert to Judaism with an Orthodox rabbi. Another community leader, a well-respected Orthodox rabbi, told Emma to

14

contact Freundel to inquire about conversion because of Freundel's ability to "approve" Orthodox conversions in his various capacities with the RCA and Kesher Israel.

63. On or about June 21, 2012, Emma called Freundel at Kesher Israel. They spoke briefly by telephone and Freundel told her to come to Kesher Israel the next morning.

64. Emma met Freundel at Kesher Israel the next day, on June 22, 2012. The weekday morning prayer session had just ended so the only people present were Freundel, a bunch of older retired men, Emma, and another young woman who was seeking Freundel's approval to get married in Israel. The other young woman spoke with Freundel first about her desire to get married in Israel. At the end of their conversation, Emma overhead Freundel tell the young woman "You don't have to pay me. Just smile."

65. Throughout the fourteen months Emma sought to convert to Judaism with Freundel, Freundel and Emma had multiple one-on-one meetings, including meetings on or about June 22, July 20, July 27, September 12, and October 18, 2012, and February 25, March 1, and August 25, 2013. The meetings were awkward and uncomfortable for Emma because Freundel made repeated references to Emma's "looks" and did not seem interested in discussing her spiritual development. In addition, while Freundel often bragged about his prominence within the RCA and touted his relationship with the Chief Rabbi in Israel, Emma found his prescriptions for conversion to be arbitrary and disconnected from any recognized religious teachings.

66. For instance, Freundel required Emma to attend multiple lectures organized by Freundel on various topics related to Jewish history and Jewish religious studies. Freundel gave Emma an open invitation to attend all services at Kesher Israel and she did, in fact, attend multiple Shabbat services, holiday services, and holiday celebrations at Kesher Israel.

67.     On or about September 26, 2012, while at Kesher Israel for Yom Kippur services, Emma told Freundel that her father had passed away four years prior and told him this was a motivating factor to seek Freundel's counseling and supervision for her conversion. A few weeks later, during a one-on-one meeting with Freundel, Emma told him that her father's yahrtzeit[6] was coming up the following week.

68.     The following week, without request or inquiry from Emma, Freundel called Emma and invited her to do a "practice dunk" at the NCM/Kesher Israel Mikvah the very next day on October 24, 2012. Freundel told Emma the "practice dunk" "does not count" and that she would be required to immerse again prior to completion of her conversion. Emma found that statement both odd and inconsistent with her understanding of Jewish law.

69.     On or about October 24, 2012, Emma went to the NCM/Kesher Israel Mikvah. Three other women she did not know and never saw again were also present. Emma was the last of the four women to do a "practice dunk." Freundel accompanied Emma into the Changing Room. When Emma started to place a water bottle on the counter of the sink in front of the clock-radio, Freundel sternly warned her not to disturb the clock-radio. Freundel then specifically directed Emma where she should place her clothing when she undressed. Once Freundel had exited the Changing Room area, Plaintiff Shulevitz disrobed, showered, entered the mikvah's ritual bath area, and immersed herself while fully nude in the mikvah. Following her "practice dunk," Freundel invited Emma to come back to the NCM/Kesher Israel Mikvah as frequently and often as she wished.

70.     That was the only time Emma visited the NCM/Kesher Israel Mikvah.

---

[6]   "Yahrzeit" is the anniversary of someone's death – especially that of a parent – and is remembered and commemorated by lighting a yahrzeit candle the night before the anniversary and allowing the candle to burn down and extinguish itself.

71.     On or about August 25, 2013, more than a year after Emma commenced the conversion process under Freundel, Emma and Freundel had another one-on-one meeting. While in Freundel's office at the Rabbinical Residence, Emma demanded that Freundel authorize her conversion immediately or she would go with a different rabbi. Freundel responded, "Fine, but it won't be accepted in Israel."

72.     On or around August 28, 2013, Emma traveled to New York City and converted with a different sponsoring rabbi in a mikvah located in Manhattan's Lower East Side.

73.     On or around December 6, 2013, Emma moved to Rockville, Maryland to attend a different Orthodox synagogue and escape Freundel and Kesher Israel.

74.     Emma's shock and horror to learn of Freundel's acts is compounded by the fact that her own Orthodox synagogue in Rockville, Maryland, refused to support her following the community's discovery of Freundel's betrayal and, instead, shunned her for speaking out about her experience with Freundel.

### E.   FREUNDEL BRINGS NON-JEWISH COLLEGE STUDENTS – LIKE STEPHANIE – ON "FIELD TRIPS" TO THE NCM/KESHER ISRAEL MIKVAH

75.     Stephanie is a rising senior at Towson University ("Towson") who is studying in Towson's Child Life program—a program that provides a multi-disciplinary approach to working with hospitalized children and their families.

76.     Stephanie took Freundel's Faith Perspectives in Medical Ethics course (the "Medical Ethics" course) as part of her Child Life focus in the fall semester of 2013.

77.     Stephanie was an active student in the Medical Ethics course and was impressed with Freundel's broad knowledge of the Jewish faith and of his leadership positions within the RCA, Kesher Israel, and NCM.

78.     On several occasions, Stephanie informed Freundel that she is not Jewish, that she has no desire to convert to Judaism, and that she does not associate with any religious group.

79.     Nonetheless, Freundel encouraged Stephanie, and other young, female Towson students, both Jewish and non-Jewish, to go on "field trips" to Kesher Israel and the NCM/Kesher Israel Mikvah and to participate in the immersion ritual at the NCM/Kesher Israel Mikvah.

80.     On November 10, 2013, Stephanie went on such a "field trip" with several other young women who were also Towson students. While several of the young women from Towson participated in the immersion ritual at the NCM/Kesher Israel Mikvah, Stephanie did not feel comfortable doing so, so she declined.

81.     At the next Medical Ethics class, Freundel expressed his disappointment and surprise that Stephanie had chosen  not to participate in the immersion ritual and he encouraged her to return on a future "field trip" to try an immersion.

82.     On February 16, 2014, in another "field trip" of young, female Towson students selected by Freundel, Stephanie went back to the NCM/Kesher Israel Mikvah and, this time, participated in the immersion ritual. Freundel showed Stephanie and the other young women from Towson the Changing Room and directed them regarding the pre-immersion preparation procedures to follow.

83.     No one questioned Stephanie about not being Jewish or a conversion candidate and it was Stephanie's understanding that the majority of the Towson students participating in the immersion ritual on both of her "field trips" to Kesher Israel and the NCM/Kesher Israel Mikvah were neither Jewish and nor conversion candidates.

84.    Freundel continued to stay in touch with Stephanie after her second visit to the NCM/Kesher Israel Mikvah.

85.    Freundel routinely called Stephanie late at night and after business hours from a cellular telephone that was not listed in his name. Freundel also repeatedly invited Stephanie to attend weekend retreats, which she declined to do.

F.    **FREUNDEL'S CRIMINAL WRONGDOING COMES TO LIGHT**

86.    On or about September 28, 2014, a woman in charge of maintaining the NCM/Kesher Israel Mikvah's Changing Room who, upon information and belief, is or was an employee of Kesher Israel and/or NCM, noticed Freundel place a "Dream Machine" clock-radio in the Changing Room adjacent to the shower. The woman advised Freundel that there was already a clock on the wall of the Changing Room, to which Freundel responded "this clock will help with the ventilation in the shower."

87.    On or about October 12, 2014, the same Kesher Israel/NCM employee removed the "Dream Machine" clock-radio she had seen Freundel place in the Changing Room, examined it, and discovered that it contained hidden electronic recording devices including, but not limited to, a hidden camera and memory card.

88.    On or about October 14, 2014, officers of the District of Columbia Metropolitan Police Department ("MPD") arrested Freundel and criminally charged him with, among other charges, voyeurism. MPD's investigation is ongoing.

89.    Also on or about October 14, 2014, MPD officers executed search warrants on both Kesher Israel and the Rabbinical Residence.

90.    To date, police searches of the Rabbinical Residence, Kesher Israel, and other offices maintained by Freundel have revealed, among other things, the following: several laptop computers, desktop computers, external computer hard drives, digital cameras, memory cards,

flash drives, electronically deleted files labeled with women's names, a second clock with a hidden camera and memory card, a tissue box containing a hidden camera, a fan containing a hidden camera, a computer charger containing a hidden camera, and nude photographs of women.

91.    MPD and several other area law enforcement agencies are conducting investigations into Freundel's criminal sexual exploitation.

### G.    FREUNDEL'S ILLICIT SURVEILLANCE AND SEXUAL EXPLOITATION OF PLAINTIFFS AND THE MEMBERS OF THE CLASS

92.    Upon information and belief, on each of Plaintiffs' and Class Members' visits to the NCM/Kesher Israel Mikvah, Freundel intentionally placed in the Changing Room a clock-radio containing an electronic recording device capable of capturing video, audio, and/or still images. Freundel did so for the purpose of surreptitiously observing, electronically recording, and intentionally capturing video, audio, and still images of Plaintiffs' and the Class Members' private areas while Plaintiffs and the Class Members were using the Changing Room, were disrobing and showering, and were totally or partially undressed in both the Changing Room and the ritual bath area of the mikvah. Freundel further willfully and intentionally intercepted, or in the alternative, willfully endeavored to intercept, through the means of an electronic recording device, Plaintiffs' and the Class Members' oral communications while they were using the Changing Room and the mikvah. Freundel committed all of these acts without notice to Plaintiffs and the Class Members and without their knowledge or consent.

93.    Upon information and belief, on each of Plaintiffs' and Class Members' visits to the NCM/Kesher Israel Mikvah, Freundel had installed cameras and/or other electronic surveillance and recording devices in the ritual bath area of the NCM/Kesher Israel Mikvah and, without Plaintiffs' and the Class Members' knowledge or consent, Freundel captured images

and/or recorded video and audio of Plaintiffs and the Class Members while they were completely naked for the express purpose of sexually exploiting them.

94.     Upon information and belief, Freundel willfully and intentionally captured, possessed, and/or distributed images, audio-recordings, and/or video depicting Plaintiffs and the Class Members while they were in a state of undress andwithout their knowledge or consent.

95.     Upon information and belief, Freundel used equipment owned by Kesher Israel to capture Plaintiffs' and the Class Members' images, oral communications, and/or video and, upon information and belief, Freundel stored the video, audio-recordings, and/or photographs depicting Plaintiffs and the Class Members in or on devices and/or equipment owned by Kesher Israel in his Kesher Israel office and/or at the Rabbinical Residence.

**H.     RED FLAGS IGNORED BY KESHER ISRAEL, NCM, AND THE RCA, AND THEIR WILLFUL BLINDNESS TOWARD THE PLAIN WARNING SIGNS**

96.     Based upon Freundel's planning and urging, Defendants Kesher Israel and NCM opened the NCM/Kesher Israel Mikvah in 2005 under the name "National Capital Mikvah."

97.     The manner in which the NCM/Kesher Israel Mikvah was operated and Freundel's use and management of it raised serious concern both within Kesher Israel and NCM and in the greater Washington D.C. community at large.

98.     Fundamentally, although Freundel purported to be an Orthodox rabbi, he used the NCM/Kesher Israel Mikvah in ways that were directly at odds with Kesher Israel's Orthodox Jewish foundations, including (without limitation):

a. Freundel opened the NCM/Kesher Israel Mikvah to non-Jews and unmarried women, who ordinarily are not welcomed at an Orthodox mikvah.

b. The unmarried women and conversion candidates Freundel encouraged to attend the NCM/Kesher Israel Mikvah were predominately young women and it was

21

common knowledge and openly remarked upon at Kesher Israel and NCM that all of Freundel's "converts" were described by some as "attractive young women."

c.  Freundel developed an entirely new exercise, which he called "practice dunks," to encourage conversion candidates to come to the NCM/Kesher Israel Mikvah more than once, and which Freundel *required* all conversion candidates to do prior to the conversion immersion – a practice completely at odds with Orthodox Judaism and the conversion process – as emergence from the mikvah completes an individual's conversion from non-Jew to Jew.

d.  Since Freundel's arrest, the RCA has publicly rebuked the concept of "practice dunking," confirming the practice has no basis in Judaism.

e.  Freundel also sometimes required recently converted women to perform "re-dunks," claiming that there was a Jewish legal problem with the conversion immersion, however, the "re-dunks" did not occur with the three rabbi "witnesses" as is required for conversion, but rather with only Freundel present.

f.  Freundel brought so many young women through the NCM/Kesher Israel Mikvah, a member of Kesher Israel's own staff stated that Freundel "treated that mikvah like a car wash. Every Sunday, six students at a time."

99.    Kesher Israel congregants had also launched numerous complaints regarding Freundel's "constant" comments praising female congregant's appearance, remarking on their dating life, and discouraging them from dressing "so modestly."

100.    Freundel generally behaved in an inappropriate manner with young female converts and congregants and he was commonly described by female members of the Kesher

22

Israel and NCM communities as "creepy" due to his regular "borderline sexual" comments to female conversion candidates and congregants, especially converts.

101.   Defendants were, or should have been, aware of public accusations of impropriety by Freundel.

102.   Upon information and belief, Kesher Israel received numerous complaints that Freundel was using the NCM/Kesher Israel Mikvah in an inappropriate manner and was otherwise acting not in accordance with Orthodox Jewish tenets, including (without limitation):

a.   As early as 2006, Kesher Israel congregants, other rabbis, and Orthodox religious leaders were made aware of accusations that Freundel was intimidating, extorting, and otherwise mistreating his conversion students, who were mostly young women.

b.   Reports were made that Freundel had brought his young female conversion students to his home, where they were alone with him, and forced them to perform various clerical and other duties at the Kesher Israel Rabbinical Residence.

c.   Freundel's exercise of "practice dunks" was also brought to the attention of Kesher Israel, other rabbis, and other Orthodox religious leaders.

d.   Media reports indicate that, as early as 2009, the former Vice President of Kesher Israel's Board of Directors was aware of inappropriate conduct by Freundel against his conversion students.

e.   Kesher Israel congregants complained that Freundel routinely made inappropriate comments to young women, treated "attractive" young women preferentially, and "manipulated and controlled" conversion students in his care.

103.   According to media reports, approximately ten to fifteen years ago, around the same time Freundel was leading the charge to construct the NCM/Kesher Israel Mikvah, Kesher Israel responded to persistent complaints, concerns, and criticism of Freundel from members of its congregation by issuing a statement to the congregation, essentially a religious "gag" order, ordering congregants "to cease to participate in any Lashon Hara,[7] to stop listening to insinuations and attacks, to disassociate ourselves from them, and finally to respond forcefully in opposition to Lashon Hara" against Freundel. From that point on, Kesher Israel congregants were forbidden from complaining about or criticizing Freundel and were further required to affirmatively support Freundel if they overheard any such complaints.

104.   In addition, Kesher Israel was made aware of at least two formal complaints launched against Freundel with the RCA. Although the full details of the complaints are not known, it is clear that Freundel was accused of abusing converts and of potential sexual impropriety with at least one convert or conversion student. The RCA's investigations into the complaints involving one of its own leaders were handled by two prominent attorneys who now head major Jewish organizations: Allen Fagin of the Orthodox Union and Eric Goldstein of UJA-Federation of New York. The RCA's investigations and the subsequent slaps on the wrist it administered to Freundel were described by one critic as "totally incompetent."

105.   Kesher Israel was specifically aware of the complaints to the RCA and it was further advised of the RCA's failure to take any meaningful action.

106.   MPD's investigation has revealed that the "Dream Machine" clock-radio that ultimately led to Freundel's downfall was observed in the NCM/Kesher Israel Mikvah Changing Room at least two years before any action was taken to investigate the out-of-place item, but

---

[7]   "Lashon Hara" means slanderous, negative talk, which is considered sinful in Judaism.

certain media reports indicate the clock-radio may have been present in the NCM/Kesher Israel Mikvah's Changing Room as far back as 2010.

107. Kesher Israel and/or NCM negligently and/or recklessly permitted Freundel to place the "Dream Machine" clock-radio and/or other electronic recording devices in the Changing Room and the ritual bath area of the NCM/Kesher Israel Mikvah. Kesher Israel and/or NCM, with negligent and/or reckless disregard for the safety, privacy, and well-being of the Kesher Israel congregants, female conversion candidates, and other women using the NCM/Kesher Israel Mikvah, including, but not limited to, Plaintiffs and others, failed to inquire, inspect, or investigate why Freundel was placing electronic devices in the Changing Room and the ritual bath area of the mikvah.

108. The RCA also negligently or recklessly ignored the obvious signs that Freundel was acting inappropriately with Kesher Israel congregants, female conversion candidates, and other women using the NCM/Kesher Israel Mikvah, including, but not limited to, Plaintiffs and others, and failed to appropriately inquire into or investigate Freundel's unacceptable and bizarre behavior.

109. Additionally, Kesher Israel and the RCA affirmatively silenced anyone who questioned Freundel, spoke out against him, or tried to bring any new issues out into the open. After the news broke about the discovery of the "Dream Machine" clock-radio, Emma spoke with various media outlets about her experience, publicly speaking out against Freundel. Instead of hearing compassion and concern from these Defendants, Emma was silenced and shunned by her now former congregation in Rockville, Maryland. The Rabbi himself chastised Emma and her husband for publicly discussing the Freundel allegations. This is merely one small example

of how Kesher Israel and the RCA have tried to sweep Freundel's unacceptable behavior under the rug and intentionally ignored the warning signs.

## I.   GEORGETOWN'S WILLFUL BLINDNESS TOWARD THE PLAIN WARNING SIGNS

110.   Georgetown has a long association with Freundel, who has taught classes and has been involved in Jewish life in various capacities at both Georgetown's main campus and at Georgetown Law.

111.   Kesher Israel is located in the same community as Georgetown's main campus, where members of Washington's elite reside and socialize.

112.   Upon information and belief, members of the Georgetown faculty were congregants at Kesher Israel and were active in the congregation throughout Freundel's tenure as Kesher Israel's Rabbi.

113.   Freundel generally behaved in an inappropriate manner with young female students and congregants and, like the female members of the Kesher Israel and NCM communities, the female members of the Georgetown community commonly described Freundel as "creepy."

114.   Upon information and belief, Freundel had lured other Georgetown Law students before Plaintiff to the NCM/Kesher Israel Mikvah using his position at Georgetown Law to sexually exploit these young women.

115.   Upon information and belief, despite Freundel's widespread reputation for abusing his young female students and conversion candidates and for engaging in other inappropriate behaviors, Georgetown undertook no investigation into Freundel's background prior to hiring him as an adjunct professor at Georgetown Law.

116.   Furthermore, upon information and belief, Georgetown undertook no investigation prior to allowing Freundel to invite Georgetown Law students to participate in the

26

immersion ritual at the NCM/Kesher Israel Mikvah, despite widespread public controversy concerning the NCM/Kesher Israel Mikvah and Freundel's practices and policies with regard to the same.

117.   Upon information and belief, Georgetown undertook no efforts to warn its students and/or members of its community about widespread public concerns surrounding Freundel and/or the NCM/Kesher Israel Mikvah.

## IV.   CLASS ALLEGATIONS AGAINST KESHER ISRAEL, NCM, AND THE RCA

### A.   MAINTAINABILITY OF CLASS ACTION

118.   Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

119.   The "Class" consists of all women who participated in an immersion ritual at the NCM/Kesher Israel Mikvah (the "immersion"): (i) while Freundel was an actual and/or apparent agent, servant, and/or employee of Kesher Israel, NCM, and/or the RCA, (ii) where Freundel initiated, arranged, participated in or was otherwise involved in the immersion, and (iii) who, through cameras, surveillance equipment, recording devices, or other surreptitious means positioned or contrived by Freundel individually or at his request or direction, were involuntarily and secretly photographed or recorded by any means or otherwise subjected to invasions of their privacy in connection with the immersion. The Class is maintainable under D.C. Super. Ct. Civ. P. Rule 23(a) for the reasons that follow. All three Named Plaintiffs are representatives of the Class.

120.   The identity of the members of the Class will be readily ascertainable through the records of Defendants Kesher Israel, NCM, and/or the RCA in conjunction with records and documents obtained by the MPD and other law enforcement organizations.

121.    The members of the Class are likely to exceed 100 or more individuals and, therefore, are so numerous that joinder of all members is impracticable. According to media reports, police detectives believe there could be upwards of 200 victims and some of them could be as far away as Israel.

122.    The questions of law and fact in this action are common to the Class and predominate over any question affecting only individual Class members. These common questions include (without limitation):

      a.    Whether Freundel was an actual and/or apparent agent, servant, and/or employee of Kesher Israel, NCM, and/or the RCA at any or all relevant times;

      b.    Whether Freundel obtained consent to take videos and/or photographs of the Class members;

      c.    Whether Freundel acted within the scope of his employment and/or agency when he captured videos and/or photographs of the Class members while they were participating in the immersion ritual and the "practice dunks" that Freundel supervised and oversaw at the NCM/Kesher Israel Mikvah;

      d.    Whether Kesher Israel, NCM, and/or the RCA's actions and/or failures to act, including (without limitation) their failure to properly investigate, qualify, select, monitor, and/or supervise Freundel, resulted in foreseeable injuries or damages to the Class members;

      e.    Whether Kesher Israel, NCM, and/or the RCA had actual knowledge of or were on notice of Freundel's illicit behavior;

      f.    Whether sufficient indicia of Freundel's wrongdoing existed to put Kesher Israel, NCM, and/or the RCA on notice of Freundel's wrongdoing;

g. Whether Kesher Israel, NCM, and/or the RCA are directly liable to Plaintiff and the Class members for failing to prevent Freundel's wrongdoing that harmed Plaintiff and the members of the Class;

h. Whether Kesher Israel, NCM, and/or the RCA are vicariously liable for failing to prevent the wrongdoing of their agent, employee, and servant; and

i. Whether Freundel's wrongdoing took place within the scope and performance of his duties as an employee, agent and servant of Kesher Israel, NCM, and/or the RCA.

123. The claims of the Named Plaintiffs, who are representatives of the other members of the Class, are typical of the claims of the Class members and the defenses applicable to the Named Plaintiffs' claims are typical of the defenses likely to be asserted as to the claims asserted by members of the Class.

124. Because the Named Plaintiffs share legal interests identical to those of the Class members, the Named Plaintiffs will fairly and adequately protect the interests of the Class.

**B.    DESIRABILITY OF CLASS ACTION**

125. This action should proceed as a class action as to Kesher Israel, NCM, and the RCA under D.C. Super. R. Civ. P. 23(b)(1) because separate actions by individual members of the Class would create a risk of adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

126. Alternatively, this action should proceed as a class action as to Kesher Israel, NCM, and the RCA under D.C. Super. R. Civ. P. 23(b)(1) because questions of law or fact common to the Class predominate over any questions affecting individual plaintiffs and class

29

action treatment is superior to other available methods for the fair and efficient adjudication of this controversy between the Class and Defendants Kesher Israel, NCM, and the RCA.

127.   No member of the Class has a substantial interest in individually controlling the prosecution of a separate action but if she does, she may exclude herself from the Class upon the receipt of notice under D.C. Super. R. Civ. P. 23(c).

128.   This class action can be managed without undue difficulty because the Class representatives will vigorously pursue the interests of the Class by virtue of, and as evidenced by, their actions in initiating this proceeding.

129.   Furthermore, Plaintiff's counsel is experienced in class actions and in complex civil litigation. For example, Plaintiff's counsel includes a Co-Lead Counsel in two national Internet privacy rights putative class actions: *In re: Facebook, Inc. Internet Tracking Litigation*, Case No. 5:12-md-02314-EJD (N.D. Cal.) and *In re: Google, Inc. Cookie Placement Consumer Privacy Litigation*, Case No. 12-MD-2358 (SLR) (D. Del.). Plaintiff's counsel recently has served as counsel in a similar class action based on an institutional actor's privacy invasions and is currently litigating as Co-Lead Counsel two national putative class actions against the National Hockey League and the National Football League. Plaintiff's counsel will adequately represent the interests of the Class.

## V.   CAUSES OF ACTION

### COUNT I

### NEGLIGENT HIRING, TRAINING, RETENTION AND SUPERVISION

130.   Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

131.   Plaintiffs assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the entire Class.

132.   Plaintiffs also assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

133.   Jane Doe further asserts this claim against Defendant Georgetown in her individual capacity.

134.   At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted him to remain as such for all relevant periods.

135.   At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi, professor, and/or advisor and, thereby, to render spiritual and educational services to their students, congregants, and/or community members, including Plaintiff.

136.   At all relevant times, Defendants acted by and through Freundel – their agent, servant, and/or employee – acting within the scope and course of his agency and/or employment.

137.   At all relevant times, Defendants owed a continuing duty to: reasonably, carefully, and conscientiously secure the services of qualified and well-trained agents, servants, and/or employees; to properly investigate, credential, qualify, select, monitor, and supervise their agents, servants, and/or employees; to promulgate and enforce proper and effective standards, procedures, protocols, systems, and rules to ensure quality care, safety, and privacy of Plaintiffs and members of the Class; and to otherwise assure and maintain the safety and privacy of Plaintiffs and members of the Class.

138.   Defendants negligently breached the above-mentioned duties by hiring, retaining, failing to properly train, and failing to properly supervise Freundel, despite his reputation for improper, unlawful, inappropriate, lewd, and unprofessional conduct.

139.   Defendants knew or should have known that Freundel engaged in improper, unlawful, inappropriate, lewd, and unprofessional conduct, including, but not limited to, photographing and/or videotaping Plaintiffs and other Class Members while naked and without consent or authorization, and distributing and/or publishing those images and/or videos without consent or authorization.

140.   As a direct and proximate result of Defendants' negligent hiring, training, retention, and supervision of Freundel, Plaintiffs and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

## COUNT II
### NEGLIGENT ENTRUSTMENT

141.   Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

142.   Plaintiffs assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the entire Class.

143.   Plaintiffs also assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

144.   Jane Doe further asserts this claim against Defendant Georgetown in her individual capacity.

145.   At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted him to remain as such for all relevant periods.

146.   At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi, professor, and/or advisor and, thereby, to render spiritual and educational services to their students and/or congregants, including Plaintiffs.

147.   At all relevant times, Defendant Georgetown owed a continuing duty to Plaintiff Doe to use reasonable care to ensure Freundel was trustworthy, competent, and fit to safely and appropriately utilize the facilities, devices, equipment, machines, and/or supplies entrusted to him for spiritual and/or educational purposes.

148.   At all relevant times, Defendants Kesher Israel, NCM, and the RCA owed a continuing duty to Plaintiffs and the Class to use reasonable care to ensure Freundel was trustworthy, competent, and fit to safely and appropriately utilize the facilities, devices, equipment, machines, and/or supplies entrusted to him for spiritual and/or educational purposes.

149.   At all relevant times, Defendants Kesher Israel, NCM, and the RCA owed a continuing duty to  use reasonable care to ensure Freundel was trustworthy, competent, and fit to safely and appropriately utilize the facilities, devices, equipment, machines, and/or supplies entrusted to him for the purposes of mentoring and sponsoring their conversions to Judaism.

150.   At all relevant times, Defendants knew or should have known, and/or had actual knowledge, constructive knowledge, and/or reasonable suspicion that Freundel was using the Defendants' facilities, devices, equipment, machines, and/or supplies to engage in unprofessional, unlawful, and outrageous conduct by photographing and/or video-recording his

33

(and Defendants') students, congregants, and/or community members, including Plaintiffs and, for Kesher Israel, NCM, and the RCA, members of the Class, without authorization or consent.

151.    Defendants breached these duties by entrusting Freundel with the facilities, devices, equipment, machines, and/or supplies that he used to perform the tortious and illegal acts alleged herein, and Defendants knew or should have known Freundel would use the facilities, devices, equipment, machines, and/or supplies entrusted to him to harm his (and Defendants') students, congregants, and/or community members.

152.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

## COUNT III

### VICARIOUS LIABILITY – *RESPONDEAT SUPERIOR* NEGLIGENCE & NEGLIGENCE *PER SE*

153.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

154.    Plaintiffs assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

155.    Plaintiffs also assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

34

156.   Jane Doe further asserts this claim against Defendant Georgetown in her individual capacity.

157.   At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted Freundel to remain as such for all relevant periods.

158.   At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi, professor, and/or advisor and, thereby, to render spiritual and educational services to their students, congregants, and/or community members, including Plaintiffs.

159.   At all relevant times, Freundel owed a continuing duty to assure and maintain the safety and privacy of his Georgetown Law students, Kesher Israel congregants, participants in the immersion ritual at the NCM/Kesher Israel Mikvah, and various other members of the public.

160.   Freundel breached this duty by, among other things, photographing, videotaping, and/or otherwise sexually exploiting Plaintiff Doe when she participated in the immersion ritual at the NCM/Kesher Israel Mikvah in furtherance of her research paper for the Jewish Studies class she was enrolled in at Georgetown Law.

161.   Freundel breached this duty by, among other things, photographing, videotaping, and/or otherwise sexually exploiting Plaintiff Shulevitz when she participated in a "practice dunk" at the NCM/Kesher Israel Mikvah at Freundel's suggestion and invitation, and in furtherance of her conversion to Judaism with Freundel as the sponsoring rabbi before the RCA-created Washington Beth Din.

162.   Freundel breached this duty by, among other things, photographing, videotaping, and/or otherwise sexually exploiting members of the Class while they participated in the

immersion ritual and/or "practice dunks" at the mikvah owned and/or controlled by Kesher Israel and/or NCM.

163.    In addition and in the alternative, Defendants owed Plaintiffs and the Class duties grounded in criminal statutes designed to protect Plaintiffs and members of the Class from sexual exploitation including, without limitation: D.C. Code Ann. §§ 22–3531(b), (c), (d), and, upon information and belief, (f)(2).

164.    Defendants breached these duties by virtue of Freundel's violation of these statutes while he was Defendants' agent, employee, and/or servant. Freundel's violation of those statutes constitutes negligence per se as a matter of the law of the District of Columbia.

165.    As a direct, proximate, immediate, and foreseeable result of the foregoing breaches of Defendants' duties, Plaintiffs and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

166.    As the principals, masters, and/or employers of Freundel, Defendants are liable for all of the injuries and damages caused by the negligent acts committed by Freundel within the scope of his employment and/or agency, and/or for his negligence per se in violating wiretapping and criminal voyeurism statutes while acting as Defendants' agent, employee, and/or servant.

## COUNT IV

### DIRECT NEGLIGENCE

167.   Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

168.   Plaintiffs assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

169.   Plaintiffs also assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

170.   Plaintiff Jane Doe further asserts this claim against Defendant Georgetown in her individual capacity.

171.   At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted Freundel to remain as such for all relevant periods.

172.   At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi, professor, and/or advisor and, thereby, to render spiritual and educational services to their students, congregants, and/or community members, including Plaintiffs.

173.   At all relevant times, Defendants owed a continuing duty to assure and maintain the safety and privacy of their students, congregants, and participants in the immersion ritual at the NCM/Kesher Israel Mikvah.

174.   In addition and in the alternative, Defendants owed Plaintiffs and the Class a duty to exercise reasonable care under all of the circumstances to protect persons lawfully on their premises from dangers of which they were or should have been aware and over which they had the ability to exercise control. As discussed above, Defendants had actual and/or constructive

37

knowledge and/or notice of the danger posed by Freundel and had the ability to exercise control over him.

176.   In addition and in the alternative, Defendants Kesher Israel, NCM, and the RCA owed Plaintiffs and the Class special legal duties to preserve and protect the sanctity of religious exercise.

176.   In addition and in the alternative, Georgetown owed Plaintiff Doe a special duty of care by virtue of Plaintiff's relationship as a student enrolled at Georgetown Law.

177.   Defendants breached these duties by failing to take any meaningful action to prevent Freundel from sexually exploiting Plaintiffs and members of the Class, despite clear warning signs and numerous red flags.

178.   As a direct, proximate, immediate, and foreseeable result of Defendants' conduct, Plaintiffs and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

## COUNT V

### VICARIOUS LIABILITY – *RESPONDEAT SUPERIOR*
### INVASION OF PRIVACY—INTRUSION UPON SECLUSION

179.   Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

180.    Plaintiffs assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the entire Class.

181.    Plaintiffs also assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

182.    Plaintiff Jane Doe further asserts this claim against Defendant Georgetown in her individual capacity.

183.    At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted Freundel to remain as such for all relevant periods.

184.    At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi, professor, and or advisor and, thereby, to render spiritual and educational services to their students, congregants, and/or community members, including Plaintiffs.

185.    Freundel invaded the privacy of Plaintiff Jane Doe by, among other things, photographing, videotaping, and/or otherwise sexually exploiting Jane Doe when she was in the Changing Room and participated in the immersion ritual at the NCM/Kesher Israel Mikvah in furtherance of her research paper for the Jewish Studies class she was enrolled in at Georgetown Law.

186.    Freundel invaded the privacy of Plaintiff Emma by, among other things, photographing, videotaping, and/or otherwise sexually exploiting Emma while she was in the Changing Room and participated in a "practice dunk" at the mikvah owned and/or controlled by Kesher Israel and/or NCM in furtherance of her conversion to Judaism with Freundel as the sponsoring rabbi before the RCA-created Washington Beth Din.

187.   Freundel invaded the privacy of Plaintiff Stephanie by, among other things, photographing, videotaping, and/or otherwise sexually exploiting Stephanie while she was in the Changing Room and participated in the immersion ritual at the mikvah owned and/or controlled by Kesher Israel and/or NCM in conjunction with the "field trip" Freundel organized for select female Towson students.

188.   Freundel invaded the privacy of members of the Class other than the Named Plaintiffs by, among other things, photographing, videotaping, and/or otherwise sexually exploiting them while they were in the Changing Room and participated in the immersion ritual and/or "practice dunks" at the mikvah owned and/or controlled by Kesher Israel and/or NCM.

189.   The Changing Room and the mikvah's ritual bath areas are objectively and subjectively private, secure, and intimate places and Plaintiffs and the Class reasonably expected that they would have privacy in the NCM/Kesher Isreal Mikvah's Changing Room and ritual bath area because, among other things, the individual participating disrobes, showers naked, and participates naked in the mikvah ritual. In addition, only one person at a time is permitted to participate in the mikvah ritual, so the participant reasonably assumes she is alone in a private, secure, and intimate setting.

190.   Freundel's conduct is and would be highly offensive to an ordinary, reasonable person.

191.   As a direct, proximate, immediate, and foreseeable result of Freundel's conduct, Plaintiffs and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past,

present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

192.    As the principals, masters, and/or employers of Freundel, Defendants are liable for all of the injuries and damages caused by the intentional acts committed by Freundel within the scope of his employment.

### COUNT VI
#### VICARIOUS LIABILITY – *RESPONDEAT SUPERIOR*
#### VIOLATION OF D.C. CODE ANN. § 23–542(a)—WIRETAPPING

193.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

194.    Plaintiffs assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the entire Class.

195.    Plaintiffs also assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

196.    Plaintiff Jane Doe further asserts this claim against Defendant Georgetown in her individual capacity.

197.    This Count is brought pursuant to D.C. Code Ann. § 23-554(a).

198.    At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted Freundel to remain as such for all relevant periods.

199.    At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi, professor, and/or advisor and, thereby, to render spiritual and educational services to their students, congregants, and/or community members, including Plaintiffs.

41

200.   Upon information and belief, Freundel willfully intercepted and/or willfully endeavored to intercept Jane Doe's's oral communications by means of one or more audio electronic recording devices while she participated in the immersion ritual at the NCM/Kesher Israel Mikvah in furtherance of her research paper for the Jewish Studies class she was enrolled in at Georgetown Law.

201.   Upon information and belief, Freundel willfully intercepted and/or willfully endeavored to intercept Plaintiff Emma's oral communications by means of one or more audio electronic recording devices while she participated in a "practice dunk" at the NCM/Kesher Israel Mikvah in furtherance of her conversion to Judaism with Freundel as the sponsoring rabbi before the RCA-created Washington Beth Din.

202.   Upon information and belief, Freundel willfully intercepted and/or willfully endeavored to intercept Plaintiff Stephanie's oral communications by means of one or more audio electronic recording devices while she participated in the immersion ritual at the NCM/Kesher Israel Mikvah in conjunction with the "field trip" Freundel organized for select female Towson students.

203.   Upon information and belief Freundel willfully intercepted and/or willfully endeavored to intercept the oral communications of the members of the Class other than the Named Plaintiffs by means of one or more audio electronic recording devices while they were in the Changing Room and participated in the immersion ritual and/or "practice dunks" at the mikvah owned and/or controlled by Kesher Israel and/or NCM. The Changing Room and the mikvah's ritual bath areas are objectively and subjectively private, secure, and intimate places and Plaintiffs and the Class reasonably expected that they would have privacy in the NCM/Kesher Israel Mikvah's Changing Room and ritual bath area because, among other things,

the individual participating disrobes, showers naked, and participates naked in the mikvah ritual. In addition, only one person at a time is permitted to participate in the mikvah ritual, so the participant reasonably assumes she is alone in a private, secure, and intimate setting.

204.    All these acts were committed within the scope of Freundel's agency for and/or employment with Defendants.

205.    As a direct, proximate, immediate, and foreseeable result of Freundel's conduct, Plaintiffs and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

206.    As the principals, masters, and/or employers of Freundel, Defendants are liable for all of the injuries and damages caused by the intentional acts committed by Freundel within the scope of his employment.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

a.      Awarding Plaintiff Jane Doe compensatory damages against Defendant Georgetown in excess of the jurisdictional minimum in an amount to be proven at trial;

b.      Awarding Plaintiffs and the Class compensatory damages against Defendants Kesher Israel, NCM, and the RCA in excess of the jurisdictional minimum in an amount to be proven at trial;

c.      Awarding Plaintiffs and the Class such other relief as may be appropriate; and

d.      Granting Plaintiffs and the Class their prejudgment interest, costs, and reasonable

attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiffs demand that this case be tried by a jury on all counts.


Dated: December 18, 2014                        Respectfully submitted,


                                               Steven J. Kelly (D.C. Bar No. 1021534)
                                               Geoffrey Hengerer (D.C. Bar No. 495994)
                                               SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
                                               201 N. Charles Street, Suite 2600
                                               Baltimore, Maryland 21201
                                               Tel:  (410) 385-2225
                                               Fax:  (410) 547-2432
                                               skelly@mdattorney.com
                                               ghengerer@mdattorney.com

                                               *Counsel for Plaintiffs*

                                               Steven D. Silverman (*Pro Hac Vice* Pending)
                                               Stephen G. Grygiel (*Pro Hac Vice* Pending)
                                               Sima G. Fried (*Pro Hac Vice* Pending)
                                               SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
                                               201 N. Charles Street, Suite 2600
                                               Baltimore, Maryland 21201
                                               Tel:  (410) 385-2225
                                               Fax:  (410) 547-2432
                                               ssilverman@mdattorney.com
                                               sgrygiel@mdattorney.com
                                               sfried@mdattorney.com

                                               *Counsel for Plaintiffs*